# CIRCUIT COURT OF BALTIMORE CITY

Filed May 7, 1894.

## EX PARTE TRUST ESTATE OF THE SOUTHERN ELECTRIC CO.

*O'Brien & O'Brien, Roger W. Cull* and *A. B. Chancellor* for exceptants.

*Richard M. Venable, Wm. Pinkney Whyte, Chas. M. Armstrong* and *James L. McLane* for trustee and certain creditors.

DENNIS, J.—

On the 5th of March the trustee in this case reported to the Court a sale of all the assets of the Southern Electric Company to J. F. Morrison for the sum of $25,000 cash, the sale, however, to be subject to ratification by the Court. This sale was reported upon

the recommendation of about seventy or eighty of the creditors, representing $77,000 of the claims against the company, out of a total indebtedness of about $90,000, and was at once ratified by the Court.

A petition has been filed by three creditors, representing about $2,900, asking that the order of ratification be rescinded and the sale set aside, and alleging collusion between the trustee and purchaser in making the sale, and gross inadequacy of price, accompanied by concealment from the creditors by the trustee of the value of the assets. In order to allow the widest latitude to the inquiry, I have treated the case as if the order of ratification had not been passed, and the question was fully open therefore as to whether or not the sale was a proper one to have been made in the first instance.

The evidence shows that shortly after the execution of the deed of trust, a full inventory of the entire trust estate, including its assets of every kind, was made out by the trustee, and by him placed in the hands of a general meeting of creditors held at the Astor House, New York, at which meeting nearly all the creditors were represented, and of which all had due notice; that the creditors then appointed a committee of five, of which John A. Roebling was chairman, to consider the situation and determine what was best to be done for the protection of their interests. This committee accordingly appointed an expert accountant, who came to this city, and remained here from ten days to two weeks, examining thoroughly into the affairs of the concern, in which examination he appears to have been furnished every facility by the trustee. His report showed a most disastrous situation of affairs. The concern had lost money upon nearly all of its contracts, owing to the "absurdly low figures" at which they were taken; and upon those contracts which were uncompleted when the deed of trust was made, and which the trustee, under an order of court and with the assent of the creditors, had endeavored to complete, this accountant reported that "it has cost $2.90 to collect a net of $1.00 of the most available assets; and at this rate the cost of realizing the more doubtful and unavailable assets will be immensely increased." His conclusions in his report to the creditors were that

the construction work from the beginning of the enterprise had always been done at a dead loss, and the sooner all construction work ceased the better it would be for the creditors, that the sales from the merchandise had resulted in but little, if any, profit; that it was advisable to close up the affairs of the concern at the earliest practicable moment; that a reorganization of the company was impracticable; and he therefore recommended a sale, at "a very liberal reduction in the cost price of the stock and materials, to a reliable person or concern desiring to continue the business." It will be readily seen that, if a sale was to be made at all, it must be made to some one who was able and willing to continue the business; because the trustee had assumed the uncompleted contracts, and the trust estate was bound for their completion; a sale, *in solido*, therefore, to such a person was manifestly desirable.

Acting upon this report the committee of creditors made application to J. F. Morrison to become the purchaser, as he was acquainted with the business, and was engaged at the time in a similar business in this city. The negotiations continued for some time, awaiting Morrison's ability to raise the money, but finally resulted in an agreement on his part to give twenty-five thousand dollars cash for the entire property. The committe reported this agreement to the creditors, urging its acceptance, as under it each creditor would receive 25 per cent. cash at once for their claims, while, if the business was continued longer, they feared a much smaller percentage would be realized. Creditors, representing $77,000 out of about $90,000 of the liabilities, assented to the proposition; and upon the production to the trustee of this recommendation and assent of these creditors, he at once filed his petition setting forth these facts, and recommending the immediate ratification of the sale. The three objecting creditors say they never received the notice or recommendation of the committee of creditors; but all others of the creditors, both in Baltimore or elsewhere, appear to have received it, and from no one was there any dissent to the proposition of sale upon the terms mentioned.

It is proven, and there is no evidence tending to contradict it, that

454

the trustee had no knowledge of these negotiations between the committee of creditors and the purchaser, or of the recommendations of the committee to the other creditors, until two days before the day he reported the sale to the court; so that, the charge of collusion between the purchaser and trustee is wholly refuted by the fact that the trustee had no knowledge of the proposed sale until it had actually been agreed upon, so far as it could be agreed upon without the sanction of the court, between the creditors and the purchaser.

Equally without evidence to support it is the charge that there was concealment from the creditors by the trustee of the amount of assets or the real value of the assets of the concern. The inventory exhibited by him at the general meeting of the creditors contained a list of every asset, the stock, plant, &c., being put at the invoice value, and the accounts, bills receivable, &c., at the face value —values at which he should properly have exhibited them to the creditors —but manifestly greatly in excess, instead of depreciation of their actual values, and the *true* values, these creditors and their expert accountant were far more competent to judge of than the trustee or any other not in this line of business.

In regard to the alleged inadequacy of consideration, the assets of the concern consisted of machinery and tools, stock on hand, and bills receivable. As has been seen, a complete list of the entire assets were furnished the creditors at a general meeting shortly after the failure. The bills receivable were marked good, bad, or doubtful, according to the trustee's estimate of their character. The expert appointed by the committee of creditors made a thorough examination into the affairs of the concern, setting forth the character and extent of the assets of every kind in a very full and elaborate report—the result of his examination being a most urgent recommendation for a sale at the earliest day possible of the entire business *in solido* to some one who could carry out the burdensome contracts with which the estate was· handicapped, and that this sale should be made even at a great reduction in the estimated values. Upon this report, the committee—composed of men who, from the line of business

in which they were engaged, were specially qualified to judge of the values of assets of the character of those in question, unanimously recommended the sale of the entire concern to Morrison for $25,000 cash as soon as they secured him as a purchaser.

This, it would seem, should put an end to any attempt to set aside the sale for want of an adequate consideration. This committee, as well as the creditors, themselves, were certainly competent to judge of the value of the several kinds of assets; and when with full knowledge on their part of what they consisted, and an itemized statement of their character, no concealment or misrepresentation being practiced by the trustee, nine-tenths in amount of the creditors recommend the sale, and only three creditors, representing $2,900, out of a total indebtedness of $90,000, oppose it, the Court should have before it overwhelming testimony to justify it in refusing its sanction, on the ground of a supposed inadequacy of consideration.

But, independently of this, and even if the Court did not feel bound to respect the judgment and wishes of so large a majority of the creditors upon such a question, I am of the opinion that the consideration paid is a fair and adequate one.

There can be little discussion about the value of the machinery, tools, and stock in trade, and the parties do not differ widely about it; the main dispute is as to the bills receivable, which were marked by the trustee as good. The face value of these was considerably in excess of what they were taken at by the purchaser. But it must be recollected that many of them were not yet due; many were for work which was not yet completed, and judging from the experience of this company as to past contracts, there were certain to be off-sets and recounter-claims for alleged failures to do the work according to specifications, &c.; in addition to which must be added the costs and delay in collection. All these items materially reduce the present cash value of these accounts. It is also to be considered that by the sale, the trust estate was relieved of the obligation to complete the outstanding contracts— the completion of which was certain to be attended by great loss, owing to the low rates at which they had been taken. Under these circumstances, I

think the creditors acted wisely and prudently in urging a sale of the entire concern at a price which would net them 25 per cent. of their claims in cash at once—a much larger dividend, I am persuaded, than they would have received had the business been continued by the trustee until all the contracts had been completed, and then been sold out and closed in the usual way.